**FUSSELL v. MIDLAND CONST. CO. et al.***

No. 4487.

Court of Appeal of Louisiana. Second Circuit.

Feb. 6, 1933.

P. S. Gaharan, Jr., of Jena, for appellants.

Vinson M. Mouser, of Columbia, for appellee.

TALIAFERRO, J.

Defendant the Midland Construction Company was awarded a contract by the Louisiana highway commission to construct that part of the Archie-Centerpoint highway in the parish of La Salle, including the clearing and grubbing of the right of way. This company sublet to the defendant Wills Construction Company a part of said highway construction contract, with the same conditions and obligations as were incorporated in its contract with the highway commission. The Union Indemnity Company, also made defendant, issued to each of said companies a policy of insurance, whereby it agreed to pay, and did insure the payment of, all claims for workmen's compensation that arose in the performance of said contracts.

Plaintiff was employed by the Wills Construction Company to perform ordinary manual labor on said work, and on May 26, 1931, while thus engaged, he was injured by being struck by a skidding log, being removed from the right of way, falling against his right leg, striking it between the knee and ankle, with the result that both bones, the tibia and fibula, were fractured, and the flesh, muscles, nerves, ligaments, and blood vessels at the site of the wound were bruised. Plaintiff was given surgical and medical attention at the expense of the Union Indemnity Company, and was finally discharged by its physicians on February 24th, as well, or at least in a condition to resume work.

Compensation at the rate of $9.75 per week was paid plaintiff by the bond company until March 15, 1932, 42 weeks, and then discontinued, and further payments refused.

This suit was instituted by plaintiff against said two construction companies, the Union Indemnity Company and the Louisiana highway commission, to recover compensation for 125 weeks at the rate previously paid, less the payments theretofore made. He also sues

---

*Rehearing denied March 10, 1933.

for medical and surgical expenses incurred by him, and alleges that, on account of the injuries aforesaid, he has totally and permanently lost the use of his right leg and foot, and is incapacitated to do work of any reasonable character.

Defendants admit that plaintiff was injured in the manner and at the time and place by him alleged, but deny that his injury was as serious or had the effect claimed by him, and aver that he has been paid all the compensation to which he was entitled, and therefore has no cause of action against either defendant.

There was judgment in favor of plaintiff, as prayed for, and all defendants have appealed.

 It being conceded that plaintiff was entitled to compensation following the date of his injury, the question for consideration is whether or not discontinuance of compensation payments was justified. Defendants' position is that, at the time the payments were stopped, plaintiff had recovered sufficiently to resume work.

Several hours elapsed before plaintiff was taken to Dr. Enzor, at Jonesville, for attention. The leg was then swollen and the muscles contracted, and for these reasons, Dr. Enzor explains, his efforts to reduce the fracture were not as successful as he had expected. Alignment of the ends of the broken bones was attempted by the application of weights and splints. After a lapse of seven days, these were removed, and the leg was placed in a cast for three weeks. The swelling having subsided, this cast was removed and another applied. All told, the limb was in casts for six or seven weeks. At the end of that time, when the last cast had been removed, Dr. Enzor says he tried to get plaintiff to use the leg to prevent ankylosis, but discovered there was not complete calcification, and that it was necessary that another cast be applied. He sent the patient to Dr. Snelling, at Monroe, for further treatment. However, it appears that he did not reach Dr. Snelling until September 3d. Dr. Snelling states that he had an X-ray picture made of the injured leg which disclosed an old fracture of the tibia and fibula, with firm union of the latter and a callous formation in the former, but with incomplete bony union. The apposition of the two bones was considered good. It was then thought that reapplication of a light plaster cast, with well-balanced diet, would be sufficient to secure complete functional result in the bony union. The cast was applied, and the patient was allowed to return home after six weeks. He again visited Dr. Snelling on October 20th, and the cast was removed and another X-ray made. Physical examination revealed that the bones had united. The X-ray showed good callous formation and bony union.

It was the opinion of Dr. Snelling, at this time, that, if plaintiff stayed off of his leg by the use of crutches for an additional six or eight weeks, the functional result would be good.

On December 11th, plaintiff returned to Dr. Snelling for a check-up, and the doctor found a strong union in the fractured bones with what appeared to be a normal amount of callous in the fractured area, sufficient to assure normal strength in the limb. The patient was then advised to return to the doctor's office about January 1st, and he did so. Examination then confirmed former findings as to the uniting of the bones, and a return to almost complete normalcy of the soft tissues overlying the fractured area, but there remained a slight swelling in the right foot and ankle, accompanied by a small amount of pain. Plaintiff was advised at this time to bathe and massage his leg and to use it with the aid of a cane.

On February 24th he was re-examined by Dr. Snelling. Conditions were found entirely satisfactory. Dr. Snelling says that at this examination plaintiff complained of two small blisters immediately below the site of the old injury and was worried about that. Plaintiff was advised at this time that his limb had firmly united and that there would be no permanent or partial disability resulting from the injury.

On the day Dr. Snelling's evidence was taken out of court, October 15, 1932, he again examined plaintiff, and his former opinion as to his condition was again confirmed. Another X-ray picture was made on this date. He was of the opinion that there was no disability traceable to the old injury. The picture did not disclose any infection of the bony structure or of the periosteum, he said, and that, if an infection had existed for as long as a week, such a condition would be exposed by the X-ray. He accounts for the two small scabs near the point of the fracture as being the result of superficial inflammation. He did not think these sores had any causal connection with the fracture, and attached no significance to the small discolored area below it.

Dr. Bendel, of Monroe, examined plaintiff on April 15th and again on October 15th. He also examined the X-ray pictures of the leg. He corroborates the testimony of Dr. Snelling with regard to the successful union of the fractured bones, their apposition, and the healing of the tissue, muscles, etc., about the fracture. Dr. Bendel could see no cause for plaintiff's asserted disability as an aftermath of his injury, but, if such disability existed, it was due to nonuse of the leg. In his opinion, the small discolored area on the leg near the site of the fracture had no special significance; that it was due to atrophic change in the skin, involving the superficial minute nerves. He thought the

small scabs were caused by irritation or scratching of the skin, and was of the opinion that, had plaintiff discarded the crutches and cane, he would have been able to work long ago.

Dr. Kittrell, a general practitioner in the parish of La Salle, examined plaintiff on October 18th, when the case was tried, and read the X-ray picture taken three days prior. He thought the picture revealed good union of the fractured bones, with satisfactory apposition, estimated at 70 or 75 per cent., but with slightly abnormal angulation. He found some limitation of motion in the right ankle joint, caused by ankylosis brought about by insufficient use of the leg and foot, but did not think this condition, coupled with the angulation or lack of alignment of the bones, was sufficient to bring about disability. He intimated that plaintiff might be malingering.

Dr. J. E. Walsworth, of Monroe, who has had extensive training and experience in bone surgery, made a physical examination of plaintiff on June 15 and October 15, 1932. He says that plaintiff, in giving him the history of the injury, stated that the fracture was compound, and it was upon this information, to some extent, that Dr. Walsworth based some of his conclusions and opinions. However, the evidence shows that the fracture was not compound. It was his opinion, after making said examination and studying the X-ray pictures, that plaintiff will be unable to use his disabled leg for an indefinite period, if not permanently. He states that a bone may be diseased or infected and that fact may not be disclosed by the X-ray; that a negative X-ray does not necessarily prove or disprove anything. He found lack of motion in plaintiff's ankle and substranguloid joint, and that the fracture, as far as it involved the bones, had healed. Dr. Walsworth was asked to briefly state the cause of plaintiff's present disability. We quote his answer:

"The cause was precipitated by the original injury, fracture of both bones, compound of the larger bone of the leg (or tibia) thrusting itself out and tearing through the flesh, muscles, blood vessels, nerves; complicated at the time by lack of proper manipulation back into position, great spasm of the muscles, preventing retention of the bones in their position. The adhesions of these muscles in that abnormal position, and incorporation of the nerve tissues, blood vessels and muscles in scar formations, which have interfered with the blood supply, the function of the muscles, and the associated pain connected with the nerve disturbances. You understand, each muscle is enveloped in what is known as gliola tissue, which is a thin, glistening tissue and permits sliding of one muscle over or along the side of the other. If the muscle is torn, the gliola tissue scraped away, the two muscles may adhere and become through adhesions, fixed; preventing the normal slipping and sliding of them, and that is what takes place in the extension and manipulation of the ankle joint, as well as the substranguloid joint. The muscles have to slide on this, and where they have had injuries like this and infection following, you see the results as you see in this case."

Dr. Enzor was of the opinion that plaintiff was unable to work. His evidence corroborated generally that of Dr. Walsworth, with the exception that he could not find as good union of the bones as did the other physicians.

This case is no exception to the rule as regards the conflict in the evidence of the medical experts. It is a fact to be lamented that, in so many cases involving claims for damages on account of personal injuries, and especially in workmen compensation cases, the doctors who testify differ so widely in their opinions and in their reading and interpretation of X-ray pictures. Courts are bewildered when seeking to arrive at the true facts in such cases, and ofttime turn from the record, after long and diligent study, confused and uncertain.

However, in this case, all the doctors, except Dr. Enzor, state that the broken bones of plaintiff's leg have become united and that the alignment is good. His disability cannot be traced to lack of proper union of these bones. Beyond this point, there is wide difference between Drs. Enzor and Walsworth, on one side, and Drs. Snelling, Bendel, and Kittrell, on the other side. There is a paucity of lay testimony. That which is in the record tends to support plaintiff's contention.

There is no serious intimation that plaintiff is a malingerer. The record does not impress us that he is. If he is not malingering, then he must be disabled to some extent. If he is disabled, it is certain the disability is traceable to the fracture of the leg while working for the Wills Construction Company. Under direction and treatment of physicians, his leg was immobilized in casts from about June 1st to October 20th. This evidently brought about the ankylosis condition in the ankle and joints. The discoloration of the skin, the periodical festers appearing at the site of the fracture, and the bony extravasations at that point, are strongly persuasive of the theory that in that region of the leg there remains unhealed and abnormal some parts of the anatomy which were involved and injured in the fracture. These external manifestations of physical infirmity do not appear on any other part of plaintiff's body, and, by the physicians who testified for defendant, are not regarded as serious. We have the highest regard for the opinions of these doctors; yet we know that their opinions, like all others, are not infallible. They may be mistaken in their deductions. It is

strenuously urged that, if plaintiff suffers any disability at all, such is due to his own fault in not using his leg sufficiently to have prevented the conditions now present, especially the ankylosis. This may be true to some extent. We do not think the condition was brought about entirely by nonuse of the leg. We will not conclude, except upon positive testimony, that any one would willfully run the risk of total loss of use of a limb for life, perhaps, in order to secure compensation for the short period of 83 weeks.

Plaintiff says he has made considerable effort to walk without a cane, but cannot do so. He cannot stand on his right foot long at a time. It is conceded that its flexation is not normal, and it appears from the evidence that pain results from use of it without support. Plaintiff is 55 years old. The older a person is, the chances for complications to arise from a fracture are increased. Nature is not as virile in one past the age of 50 as it is in youth.

The trial judge evidently observed the evidence closely as it was introduced; he interrogated some of the witnesses. Plaintiff was required in open court to bare his right leg and foot for examination. He was in much better position than we to fully appreciate plaintiff's condition, from the evidence and circumstances. He saw and heard most of the witnesses who testified in the case. His conclusions are not manifestly erroneous, and, unless we should find such to be the case, we would not be justified in reversing his judgment.

Judgment affirmed.